**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**

Bryan M., by and through
his parents, Keith M. and Denise M.

     v.                                  Civil No. 04-cv-246-JM

Litchfield School District

## O R D E R

Plaintiff Bryan M., by and through his parents Keith M. and
Denise M. ("Parents"), filed this lawsuit against the Litchfield
School District (the "School District") under the Individuals
with Disabilities Education Act ("IDEA"), 20 U.S.C.A. § 1400, et
seq. (West 2000 & Supp. 2005) and the corresponding New Hampshire
statute, N.H. Rev. Stat. Ann. ("RSA") § 186-C, et seq. (West 1999
& Supp. 2004).  Plaintiff is aggrieved by the decision of a New
Hampshire Department of Education Hearing Officer ("Hearing
Officer") that the School District is not required to continue
providing him special education services, and that an Independent
Educational Evaluation ("IEE") that the Parents had performed to
support Plaintiff's alleged entitlement to continued services was
not properly reimbursable from public funds.  Plaintiff seeks a
judgment finding him eligible for special education services

under the IDEA, and reimbursement for the IEE used to support his claim.  The School District seeks a judgment affirming the Hearing Officer's decision.

Before the Court are the parties' respective decision memoranda and statements of material facts.  Neither party requested a hearing to present oral argument.  Accordingly, the matter is ready for resolution.

<u>Standard of Review</u>

Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living."  20 U.S.C.A. § 1400(d)(1)(A). Under the scheme established by the IDEA, and in return for federal funding, state educational agencies establish procedures to identify and evaluate disabled students in need of special education services.  <u>See</u> 20 U.S.C.A. § 1412.  For each identified child, a team comprised of the child's parents, teachers, and a representative of the educational agency develops an individualized education plan ("IEP") for the child.

An IEP consists of "a written statement for each child with

a disability that is developed, reviewed, and revised in accordance with section 1414(d) of [the IDEA]."  20 U.S.C.A. § 1401(14).  It must be "reasonably calculated to enable the child to receive educational benefits,"  Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982), and "custom tailored to address the [disabled] child's 'unique needs,'" Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1086 (1st Cir. 1993) (citing 20 U.S.C. § 1400(c)).

In this case, although the Plaintiff received special education services between the first and fourth grades, the School District determined during the student's fourth grade year that he was no longer qualified for special education services. The School District initiated a due process hearing before the state educational agency following the Parents' request for reimbursement for the cost of an IEE by a speech, language and voice pathologist.  After the due process hearing, the Hearing Officer found in the School District's favor.

If either party disputes the decision of a hearing officer, the party may ask for further review in district court.  See Lenn, 998 F.2d at 1086; 20 U.S.C.A. § 1415(i)(2).  The district court's review of state educational administrative proceedings has been described as "one of involved oversight."  Lenn, 998

3

F.2d at 1087 (citing <u>Roland M. v. Concord Sch. Comm.</u>, 910 F.2d

983, 989 (1st Cir. 1990)).  The applicable standard is an

intermediate one under which the district court must exercise

independent judgment, but, at the same time, accord "due weight"

to the administrative proceedings.

> The required perscrutation must, at one and the same
> time, be thorough yet deferential, recognizing the
> expertise of the administrative agency, considering the
> agency's findings carefully and endeavoring to respond
> to the hearing officer's resolution of each material
> issue.  Jurists are not trained, practicing educators.
> Thus, the statutory scheme binds trial courts to give
> 'due weight' to the state agency's decision in order to
> prevent judges from imposing their view of preferable
> educational methods upon the States.

<u>Roland M.</u>, 910 F.2d at 989 (citations and internal punctuation

omitted).  <u>See also</u> <u>L.T. v. Warwick Sch. Comm.</u>, 361 F.3d at 83–

84.  The burden of proof rests with the party challenging the

administrative decision – here, the Parents.  <u>See</u> <u>Hampton Sch.</u>

<u>Dist. v. Dobrowolski</u>, 976 F.2d 48, 54 (1st Cir. 1992); <u>Roland M.</u>,

910 F.2d at 991.

<u>Facts</u>[1]

---

[1]Unless otherwise stated, the facts are taken from the
Parties' Joint Statement of Facts (document no. 13), which the
Court adopts.  The Court notes that it gives deference to, and
relies upon, the Hearing Officer's Findings of Fact.  The Court
cites the Findings of Fact that were granted by the Hearing
Officer as "Finding of Fact, Parents No. __" or "Finding of Fact,

4

A.   <u>Substantive History</u>

    1.   <u>Kindergarten to First Grade</u>

Bryan M. was born on May 5, 1994.  He attended St. Francis of Assissi in Manchester, New Hampshire, for his kindergarten year.  Bryan's kindergarten teacher was concerned about Bryan's lack of progress during the year and his inability to retain information.  <u>See</u> Finding of Fact, Parents No. 4.

Bryan began attending Griffin Memorial School ("Griffin") in Litchfield, New Hampshire, during the first grade where he was referred for special education.  <u>Id.</u>  A number of evaluations were performed.  On January 9, 2001, Bryan was identified under the IDEA as a child with a specific learning disability due to a deficit in visual and auditory memory.  <u>See</u> Finding of Fact, Parents No. 9.  Bryan was determined to have deficits in written expression, basic reading and mathematics calculation.  <u>Id.</u>

Bryan's IEP was developed on February 13, 2001.  <u>See</u> Finding of Fact, Parents No. 10.  His profile stated that Bryan had a specific learning disability in reading, writing and math due to a psychological deficit in auditory and visual memory.  <u>Id.</u>  According to the IEP, Bryan was to receive reading and phonic

───────────────────

Sch. Dist. No. __."  <u>See</u> Admin. R., Vol. I, Ex. 29, Part V.

instruction in a small group setting out of the classroom for
five and a half hours a week.  Id.  He also was to receive three
and a half hours of supported sessions in written language and
two and a half hour sessions of math in the classroom or in a
pullout setting as needed.  Id.  Bryan participated in an
extended year program in the summer after he completed first
grade.  See Finding of Fact, Sch. Dist. No. 14.

In July 2001, the School District referred Bryan for a
psychological evaluation by Dr. Edward Jacobs.  The Hearing
Officer summarized Dr. Jacob's findings as follows:

> [Dr. Jacobs] diagnosed Attention Deficit Hyperactivity
> Disorder, noted high performance on the WISC III,[2] an
> unusual 32 point discrepancy between language-based
> (low average) and nonverbal (superior) intellectual
> abilities as well as a significant problem with storage
> and retrieval of language-based information and
> laterality (Ex 0101).  Jacobs also noted inconsistent
> performance in many areas.

See Admin. R., Vol. I, Ex. 29, Part IV.

2.  Second Grade

Bryan's second grade team met to go over his IEP on October
16, 2001.  Finding of Fact, Sch. Dist. No. 26.  The Parents
requested that Bryan be provided with additional services,

---

[2]The Weschler Intelligence Scale for Children III ("WISC-
III") measures intelligence.  Finding of Fact, Sch. Dist. No. 6.

including a half hour a week with a Learning Disabilities
Specialist.  Finding of Fact, Sch. Dist. No. 28.  The team met
again on April 30, 2002, at which time the team decided to place
Bryan in a collaborative classroom for the 2002-2003 school year.
Finding of Fact, Sch. Dist. No. 29.

Bryan was only able to understand stories at the first grade
level by the end of his second grade year.  See Finding of Fact,
Parents No. 17.  He was noted to do best with small group review
of decoding and comprehension skills for reading at the first
grade level and partner reading for part of the second grade
story.  Id.  He needed a word book to help him with spelling.

3.   Third Grade

Bryan's third grade IEP, for the 2002-2003 school year,
included two Reading Goals and six Reading Objectives; it also
included two Written Language Goals and four objectives and two
math goals.  See Finding of Fact, Parents No. 18.  Bryan received
a B in reading for his last quarter of third grade.  See Finding
of Fact, Parents No. 19.  However, in every quarter, including
the last, his third-grade teacher noted that his reading skills
were an area of difficulty.  Id.  Bryan received a D in his last
quarter of third grade in English.  Id.  His teacher noted that

he needed improvement in all areas under Language as of his last quarter.  <u>Id.</u>  Bryan received a C for his last quarter of spelling, but according to notes next to "Spelling" Bryan's grade was modified to include homework and tests only.  <u>Id.</u>  His teacher noted that spelling is an area of difficulty for Bryan in written work and that he needs improvement in effort and spelling words in isolation.  <u>Id.</u>  In Math, Bryan received a C in his last quarter, but his teacher noted that adding facts to 18, subtracting facts to 18, multiplying facts and measurement were all areas of difficult for Bryan.  <u>Id.</u>  By the end of the fourth quarter of his third grade year, Bryan had only achieved one of ten objectives of his IEP.  <u>See</u> Finding of Fact, Parents No. 20.

On May 15, 2003, Bryan's IEP team met and determined that Bryan did not qualify for an extended school year because "He does not regress to the extent indicated in the ESY definition." <u>See</u> Finding of Fact, Sch. Dist. No. 31.  The team decided that "all areas necessary for a learning disability should be re-tested."  <u>See</u> Finding of Fact, Parents No. 21.

The team agreed that "the least restrictive environment for Bryan would be regular class with in-class assistance by the special education team for 5 hours per week."  <u>Id.</u>  Bryan's

fourth grade IEP called for special education services continuing at five hours per week in the context of a regular classroom. <u>See</u> Admin. R., Vol. I, Ex. 29, Part IV.  Bryan was to work at grade level in reading, math, social studies and science, but needed support when written responses were required.  <u>Id.</u>  A number of modifications and accommodations were noted along with an indication that Bryan's IEP was to be reviewed following reevaluation.  <u>Id.</u>

During the summer of 2003, the School District requested that Bryan's parents give permission for Bryan to be reevaluated using the WISC-III Test, and the Woodcock Johnson Test, which measures achievement.[3]  Bryan's parents agreed.

Aurora Thompson, the School District's Psychologist, administered the WISC-III on August 19, 2003.  The result of the test revealed that Bryan's Verbal I.Q. score, 107, was in the Average range, his Performance (Non-verbal) I.Q. score, 112, was in the High Average range, and his Full-scale I.Q. score, 110,

---

[3]The IEP team chose not to administer other tests at that time including: the Wide Range Assessment of Memory and Learning ("WRAML"), the Bender Gestalt, the Behavior Assessment Scales for Children ("BASC"), the Phonological Awareness Test, the Woodcock Reading Mastery Test, and the Gray Test of Oral Reading.  <u>See</u> Finding of Fact, Parents No. 23.

was High Average.[4]  Mrs. Thompson noted that "Bryan's present
overall scores reflect similar areas of weakness and strength to
his earlier test results in 2000."  <u>See</u> Finding of Fact, Parents
No. 24.  Mrs. Thompson also noted that overall testing indicated
that Bryan has made several gains though his skills continue to
present relatively weaker in some areas.  <u>Id.</u>

    4.  <u>Fourth Grade School District Evaluations</u>

Mary Louise Saxton administered the Woodcock Johnson III
Test on September 4, 2003.  Bryan scored in the Average range on
the Broad Reading, Oral Language and Broad Math clusters.  He
scored in the Low Average Range in the Broad Written Language
cluster.  Bryan also scored in the Low Average range on certain
subtests within each cluster, including a Low Average score on
Passage Comprehension in the Broad Reading cluster, a Low Average
score on Math Fluency in the Broad Math cluster and a Low Average
score on Spelling in the Broad Written Language Cluster.  He
scored in the Average range in the remaining subtests and scored
in the High Average range in Story Recall in the Oral Language
cluster.  Ms. Saxton noted that the results should be shared with

_____

    [4]On standard testing, Standard Scores between 80 and 89 are
Low Average.  Scores between 90 and 109 are Average.  Scores
between 110 and 119 are High Average.

the team, along with the results of other evaluations, to determine whether Bryan continued to have an educational disability.  <u>See</u> Admin. R., Vol. I, Ex. 29, Part IV.

On September 5, 2003, Fern Seiden, the school guidance counselor observed Bryan in the classroom.  During the observation, students in Bryan's class were asked to read four pages silently and to write five facts from their reading in a column on their worksheet.  Bryan was only able to write two facts after approximately ten minutes of reading.  Most of the other students in the class had come up with the five requested facts.  Ms. Seiden noted that while doing independent work, Bryan shut down.  <u>See</u> Finding of Fact, Parents No. 36.

Members of the IEP team were concerned about, but unsure how to evaluate, the role of stress caused by family change on Bryan's school performance and on reevaluation.  <u>See</u> Admin. R., Vol. I, Ex. 29, Part IV.  Bryan was dealing with his Parent's divorce and with the death of his dog at the beginning of his fourth grade year.  Df.'s Statement of Disputed Facts, No. 15.

On September 16, 2003, the IEP team met to discuss the results of Bryan's evaluations.  <u>See</u> Finding of Fact, Sch. Dist. No. 35.  At the meeting, Aurora Thompson discussed Bryan's prior

history.  <u>See</u> Finding of Fact, Sch. Dist. No. 37.  Part of that
history was that Bryan had poor short-term memory and that on the
Behavior Assessment Scales for Children ("BASC") testing done in
November 2000, he scored in the "significant" range for
hyperactivity.  <u>Id.</u>  The School District decided that Bryan was
no longer eligible for special education services and determined
that "Bryan will be released from special education, but
accommodations can be made throughout his fourth grade year."
The School District found "no severe discrepancy" between Bryan's
ability and achievement.  The Parents disagreed.  Bryan's father
indicated that he was considering having an outside evaluation
done.  The School District allowed that special education
services would continue through the fourth grade.

     On November 25, 2003, the special education team met again
and reaffirmed its decision that Bryan no longer met the criteria
for a specific learning disability.  The Parents requested an
independent evaluation.  Ronda Gregg, the School District's
Director of Special Services, responded by requesting a due
process hearing or mediation.  The School District also
recommended additional testing, including the Test of Written
Language III, speech evaluation, the Bender-Gestalt, the Wide

Range Assessment of Memory and Learning ("WRAML") and behavior assessment testing.  The additional testing included tests that had been used in the past prior to determining that Bryan had a learning disability.  <u>See</u> Admin. R., Vol. I, Ex. 29, Part IV. The Parents agreed to the further evaluations, which were conducted between December 3, 2003 and January 20, 2003.

Bryan's composite scores on the Test of Written Language III for Contrived Writing, Spontaneous Writing and Overall Writing Quotient were all in the Average Range.  He scored in the Average Range on the subtests of Vocabulary, Spelling, Logical Sentences, Contextual Language and Story Construction.  Bryan scored in the Below Average Range in Style and Contextual Conventions.

The School District's Speech Language Pathologist, John F. McGarry, administered the following tests: (1) speech sample; (2) Clinical Evaluation of Language Fundamentals – 4th Edition; (3) Expressive Vocabulary Test; and (4) Peabody Picture Vocabulary Test–III.  <u>See</u> Admin. R., Vol. II at 278–280.  Mr. McGarry found that Bryan demonstrated speech/language skills in the Average Range with strengths in the Articulation, Language, Fluency and Vocal Skills.  There were relative strengths in Formulating Sentences, Word Relationships and Receptive Vocabulary.  He did

not note any significant weaknesses, but found that Bryan had relative weaknesses in Following Complex Concepts and Direction and Familiar Sequences.

On the WRAML, Bryan scored in the 8th percentile in the Verbal Memory Index, putting him in the Borderline Range.  Bryan scored in the Borderline range in the Story Memory subtest, in the Average range in the Sentence Memory subtest and Low Average in the Number/Letter Memory subtest.  Bryan scored in the 73rd percentile in the Visual Memory Index, placing him in the Average range and scored in the 39th percentile in the Learning Memory Index, placing in the Average range.  In the overall General Memory Index, Bryan scored in the Average range.

On the Bender Gestalt Test, Bryan's score dropped from low average, when he took the test in first grade, to below average on the test given in fourth grade.  Finding of Fact, Parents No. 47.  The Bender Gestalt test indicated that Bryan had difficulty with fine motor reproductions when memory is not a factor.  Id.

In the "Teacher's Rating" section of the BASC, Bryan scored Average in Externalizing and Internalizing Composites.  He scored "At-Risk" in the Atypicality scale and Average in the Withdrawal

scales.[5]  Under the "School Problems Composite," Bryan scored

"At-Risk" for Attention Problems and Learning Problems.  In the

"Adaptive Skills Composite," Bryan scored Average in the areas of

Adaptability, Social Skills and Leadership and was determined to

be "At-Risk" in Study Skills.

In the "Parent's Rating" section of the BASC, Bryan was

found to be in the "At-Risk" for hyperactivity, in the Clinically

Significant range for Aggression and in the Average range for

Conduct Problems.  In the Internalizing Composite, Bryan was

found to be Average in Anxiety and Somatization and was

Clinically Significant in the Depression category.  Bryan was

found to be in the Average range in the Atypicality and

Withdrawal scales and At-Risk in the Attention scale.  In the

Adaptive Skills Composite, Bryan was found to be At-Risk in

Adaptability and Average in Social Skills and Leadership.

"Critical Items" noted on the BASC include the category of

"Threatens to Hurt Others" where the response was "Sometimes,"

the category of "Wets Bed," where the response was "Often," the

---

[5]On the BASC, scores in the "At-Risk" range identify either
a significant problem that may not be severe enough to require
formal treatment or a potential for developing a problem that
needs careful monitoring.  A score in the Clinically Significant
range suggests a high level of maladjustment.

category of "Says, 'I want to kill myself,'" where the response was "Sometimes" and  the category of "Uses medication," where the response was "Often."

On January 6, 2004, the IEP team met again to discuss the results of the further evaluations.  Bryan's fourth grade teacher, Mrs. Margaret Parent, expressed concern that Bryan needs to be refocused, and needs reminders to write in full sentences. See Finding of Fact, Parents No. 48.  She noted that Bryan can only complete one or two-step math problems and that "more complicated problems are hard for him because of multiple steps." Id.  She noted that "1 on 1 he can usually get things done."  Id. Mrs. Parent indicated on a form agreeing with the determination that Bryan did not have a learning disability that Bryan needed accommodations, "i.e., small group, extra time, organizers as needed."  Finding of Fact, Parents No. 47; Admin. R., Vol. II at 272.  The School District again found Bryan ineligible for special education services, but proposed an accommodation plan for Bryan's A.D.D.  See Finding of Fact, Parents No. 44.

    5.   Independent Educational Evaluation

The Parents obtained an independent educational evaluation of Bryan by Toby Freeman, certified speech and language

16

pathologist, dated January 8, 2004.  Ms. Freeman evaluated Bryan using the Fisher's Auditory Problems Checklist, the Lindamood Auditory Conceptualization Test, the Test of Auditory-Perceptual Skills-R, the Test of Early Reading Ability, the Test of Written Spelling and the Token Test for Children.

The Fisher's Auditory Checklist is a checklist of parental observations.  The expected score for a fourth grade student is 85.9 percent.  Bryan scored 28 percent.

On the Lindamood Auditory Conceptualization Test, the recommended minimum score for the second half of fourth grade is 86.  Bryan's score of 97 exceed the minimum.

On the Test of Auditory Perceptual Skills, Bryan scored in the 18th and 5th percentiles respectively in the Auditory Sentence and Auditory Word Memory tasks.  These scores were in the Low Average range.  Bryan scored in the Average to Above range on the other five subtests of the Test of Auditory Perceptual Skills.  His Auditory Perceptual Quotient was 93, which is in the Average range.

On the Test of Early Reading Ability, Bryan scored in the 30th percentile, which is considered low average.  Ms. Freeman used the second edition of this test because "she liked the

17

stimuli better," although she knew that it was not the most recent version.  Best practice is to use the newest version.

On the Test of Written Spelling, Bryan scored in the 24th percentile for predictable words and in the 2nd percentile for unpredictable words.  His total word score was in the 5th percentile, which is significantly below his age level.

Bryan received a perfect score on the Token Test for Children, which measures subtle language performance.  The Token Test requires the student "to retain certain details in his memory as he performs the tasks."  Vol. III, Ex. 4 at 93.  Since Bryan had no difficulty with the test, Ms. Freeman observed that it shows that "there's some conservative strength," and that "when given shapes and colors and size, the student was able to perform simple commands."  Id. at 94.[6]

Ms. Freeman noted Bryan's frustration with oral reading

---

[6]Mr. McGarry gave following description of a task that a student might be required to perform on the Token Test:

Touch the small white square and the large white square.  In front of the child is a set of colored squares and circles of different sizes and colors.  And the child is then asked to follow and point to what the examiner says.

Vol. III, Ex. 3 at 138.

tasks and his inability to "partition" or discretely process information.  Finding of Fact, Sch. Dist. No. 57.  She opined that without special education services and proper intervention and support in the areas of working memory, phonemic support, reading and writing skills and meta-cognitive skills, Bryan would be greatly challenged and develop significant frustration, which she noted had already started to surface.

Ms. Freeman's evaluation was not reviewed by the special education team.  Id.  Mr. McGarry reviewed her evaluation and found it wanting.  Ms. Freeman's evaluation did not change his opinion regarding coding Bryan, and did not instruct him regarding the recommended therapy for Bryan's needs.  Id.

In contrast to Ms. Freeman's view that Bryan's Token Test result showed that he could follow simple commands when given shapes and colors and size, Mr. McGarry testified that Bryan's test result helped him understand that Bryan "is able to follow complex concepts and direction and alleviated some of my concern" about Bryan's relative weakness in that area.  Admin. R., Vol. III, Ex. 3 at 138.

6.   Fourth Grade School Performance

During his fourth grade year, Bryan received one hour of

19

specialized instruction with Mrs. Saxton each day, and one half

hour of one-to-one assistance from Mrs. Parent almost every day

starting in November.[7]

Mrs. Parent testified that she would not have referred Bryan

to a special education team at the beginning of his fourth grade

year if he were not already coded because he was working on the

fourth grade curriculum and seemed to be successful with the few

accommodations that she was making for him.  Admin. R., Vol. III,

Ex. 3 at 27.  She was giving Bryan extra time as needed, not

taking off point for his spelling errors unless it was on a

spelling assignment, giving him reminders and helping him

refocus.  Id. at 24, 27.  Ms. Parent felt that she could teach

Bryan with the accommodations that she was making even if he were

not receiving any special education support.  Id. at 31.

Bryan's second quarter progress reports in the fourth grade

showed the following scores: Reading, B-, Writing, D+,

Mathematics, C, Social Studies, B-, and Science, C+.  All areas

_____

[7]Bryan's Parents had difficulty helping Bryan with his
homework because they could not read Bryan's cursive writing and
Bryan could not understand most of it or remember what he was
supposed to do.  Admin. R., Vol. III, Ex. 4 at 121-122, 125.
Bryan's teacher began to write out Bryan's assignments and get
him started on his homework at school.

showed improvement over his first report card.  The Hearing

Officer granted the Parents' proposed finding of fact that:

> Bryan's classroom ability as evidenced by the writing
> sample submitted by the School District and as
> evidenced by his grades, which he has received with the
> assistance of services and with modifications to his
> grades based on spelling, indicates a severe
> discrepancy between Bryan's ability and his
> achievement.

Finding of Fact, Parents No. 56.  Still, the Hearing Officer

found that "there are deficits in evidence to some degree but

student has progressed," and that "the large discrepancy between

ability and performance has significantly decreased."  See Admin.

R., Vol. I, Ex. 29, Part IV.  The Hearing Officer further found

that Bryan was performing in the average range and up to grade

level with support.  Id.

B.   Procedural History

The School District requested an administrative due process

hearing on November 26, 2003 regarding the Parents' request for

payment for an IEE and its intent to discharge Bryan from special

education services.  A hearing was held at the New Hampshire

Department of Education on February 18, 20 and March 5, 2004.

The Hearing Officer found in favor of the School District in

a final decision of the New Hampshire Department of Education

21

dated April 9, 2004.  The Hearing Officer concluded that Bryan
was shown to have gained sufficient educational benefit to be
able to continue his education without an IEP.  The Hearing
Officer further found that the Parents' IEE was not properly
reimbursable from public funds because "It is when inadequacy is
questioned and shown in a school district's evaluations that an
independent educational evaluation is compensable and that is not
the case."  <u>See</u> Admin. R., Vol. I, Ex. 29, Part IV.  The Hearing
found that Ms. Freeman's testimony "proved insufficient to do
more than raise additional questions regarding the issues at
hand."  <u>See</u> Admin. R., Vol. I, Ex. 29, Part IV.

<u>Discussion</u>

I.   <u>Issues Presented</u>

    In addressing the Plaintiff's assertions of error in the
Hearing Officer's decision, this Court is required to carefully
consider the Hearing Officer's findings and endeavor to respond
to the Hearing Officer's resolution of each material issue.
<u>Roland M.</u>, 910 F.2d at 989.  Accordingly, the Court's review
focuses on two issues: (1) whether Bryan needs special education
services to meet the needs created by a qualifying disability;
and (2) whether the Parents demonstrated that the School

22

District's evaluation was inappropriate.

II.  Eligibility for Continuing Special Education Services

In order to determine whether Bryan was properly discharged from special education services, the first question that needed to be addressed is whether Bryan is a child with a disability. Under the IDEA, the term "child with a disability" means a child:

> (i) with mental retardation, hearing impairments
> (including deafness), speech or language impairments,
> visual impairments (including blindness), serious
> emotional disturbance . . ., orthopedic impairments,
> autism, traumatic brain injury, other health
> impairments, or specific learning disabilities; and
>
> (ii) who, by reason thereof, needs special education
> and related services.

20 U.S.C.A. § 1401(3) (emphasis added); see also 34 C.F.R. § 300.7.  The term "specific learning disability" is statutorily defined to mean "a disorder in 1 or more of the basic psychological processes involved in understanding or in using language, spoken or written, which disorder may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or do mathematical calculations."  20 U.S.C.A. § 1401(30)(A).  The statute provides examples of disorders that are included and excluded from the definition.  See 20 U.S.C.A. §

23

1401(30)(B) and (C).

The applicable implementing regulation for determining the existence of a specific learning disability provides that:

(a) A team may determine that a child has a specific learning disability if --

(1) The child does not achieve commensurate with his or her age and ability levels in one or more of the areas listed in paragraph (a)(2) of this section, if provided with learning experiences appropriate for the child's age and ability levels; and

(2) The team finds that a child has a severe discrepancy between achievement and intellectual ability in one or more of the following areas:

(i) Oral expression.
(ii) Listening comprehension.
(iii) Written expression.
(iv) Basic reading skill.
(v) Reading comprehension.
(vi) Mathematics calculation.
(vii) Mathematics reasoning.

34 C.F.R. § 300.541.

Bryan was identified in the first grade as having a specific learning disability due to processing deficits in the area of auditory and visual memory, and deficits in written expression, basic reading and mathematics calculation.  IEPs were then developed and Bryan received individualized services from the second half of first grade through fourth grade.  In order to find that Bryan was no longer eligible for special education

services after reevaluation, the Hearing Officer would have had to find that either of the following conclusions was supported by the evidence: (1) that the School District's reevaluation demonstrated that Bryan no longer had a specific learning disability, or (2) that Bryan no longer needed special education services because of his specific learning disability.  The Court considers the question of whether Bryan continues to have a specific learning disability first.

   A.   Specific Learning Disability

      The School District argues that although Bryan has weaknesses in spelling, articulation, and writing, these weaknesses do not meet the criteria for a specific learning disability.  Df.'s Decision Mem. at 11.  Bryan's deficits in written expression could qualify as a specific learning disability if he does not achieve commensurate with his age and ability levels, and if he has a severe discrepancy between achievement and intellectual ability.

      The Parents argue that although Bryan is working on grade level material with special education services his performance cannot be considered commensurate with his age and ability levels.  The Parents further argue that the differences between

Bryan's Full Scale IQ of 110 on WISC–III and his achievement scores on the Woodcock Johnson III are sufficiently drastic in numerous areas to support a finding that there is a severe discrepancy between Bryan's ability and his achievement.

The Hearing Officer did not specifically address the issue of whether or not Bryan has a specific learning disability in her decision.  Rather, the Hearing Officer simply found that "whatever residual impairment [Bryan has] does not significantly interfere with the learning process to require special education services."  The Court notes, however, that the Hearing Officer granted the Parents' proposed finding of fact that:

> Bryan's classroom ability as evidenced by the writing sample submitted by the School District and as evidenced by his grades, which he has received with the assistance of services and with modifications to his grades based on spelling, indicates a severe discrepancy between Bryan's ability and his achievement.

Finding of Fact, Parents No. 56.  Since the Parties agree that there is no fixed definition for defining severe discrepancy, the Court gives deference to the Hearing Officer's finding of fact, which supports a finding that Bryan continues to have a specific learning disability, at least with regard to written expression. The evidence in the record pertaining to Bryan's processing

deficits in the area of auditory memory further supports a
finding that Bryan continues to have a specific learning
disability.  The Court notes in particular Bryan's Borderline
performance on the Verbal Memory Index and Story Memory subtest
of the Wide Range Assessment of Memory and Learning, and his
score in the 5th percentile in Auditory Word Memory on the Test
of Auditory Perceptual Skills.  While this evidence is not
conclusive, the Court again notes that the Hearing Officer did
not find that Bryan does not have a specific learning disability.
Therefore, the Court goes on to consider whether the Hearing
Officer properly found that Bryan no longer needed special
education services.

  B. <u>Whether Special Education Services Are Necessary</u>

  The Hearing Officer found that the Supreme Court's holding
in <u>Rowley</u> provided the appropriate measure of the level of
services that Bryan was eligible to receive.  In <u>Rowley</u>, the
Supreme Court held that a State satisfies the requirement to
provide a child a "free appropriate public education" under the
IDEA where the child is provided:

> personalized instruction with sufficient support
> services to permit the child to benefit educationally
> from that instruction.  Such instruction and services
> must be provided at public expense, must meet the

27

State's educational standards, must approximate the
grade levels used in the State's regular education, and
must comport with the child's IEP.

Id. at 203.  The Hearing Officer agreed with the School District

that Bryan's continuing eligibility for special education

services should be determined based on whether Bryan has gained

sufficient educational benefit to be deemed able to continue his

education without an IEP in place for the current school year.

In response to this inquiry, the School District argued that the

fact that Bryan was working on grade level material and had

complete access to the curriculum demonstrated that Bryan had

gained sufficient education benefit to discontinue special

education services.  The Hearing Officer agreed, stating in her

decision:

Here, we view the education from the prospective of
hindsight and the question is not the adequacy of an
IEP and the individualized program to provide F.A.P.E.
but whether past special education has done its work
and raised Student's performance to the point that no
further special education is in order.  The School
District has argued that it is enough that student is
performing at an average level with complete access to
the regular curriculum for his grade.  Indeed, it seems
that is the floor and it has been reached and whatever
residual impairment exists does not significantly
interfere with the learning process to require special
education services.

See Admin. R., Vol. I, Ex. 29, Part IV (emphasis added).

28

The Parents argue that the Hearing Officer erred in using the standard set forth in <u>Rowley</u> to determine whether Bryan continued to be eligible for special education services.  The term "special education" is statutorily defined to mean, "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability."  20 U.S.C.A. § 1401(29).  As defined by the relevant IDEA implementing regulation, the term "specially-designed instruction" means:

> adapting, as appropriate to the needs of an eligible child under this part, the content, methodology, or delivery of instruction --
>
> (i) To address the unique needs of the child that result from the child's disability; and
>
> (ii) To ensure access of the child to the general curriculum, so that he or she can meet the educational standards within the jurisdiction of the public agency that apply to all children.

34 C.F.R. § 300.26.  The Parents argue that whether Bryan is performing "at an average level with complete access to the regular curriculum for his grade" is immaterial to the question of whether he remains eligible for special education.  The Court agrees.

As the text of 34 C.F.R. § 300.26 shows, the intent of specially-designed instruction is to enable a child with a

disability to gain access to the general curriculum and to meet the applicable educational standards.  Therefore, a finding that a child is performing at an average level on the regular curriculum for his grade does no more than show that the intent of specially-designed instruction is being accomplished.

The Parents contend that the Hearing Officer should have sought to determine whether the School District proved that Bryan would continue to make adequate educational progress if the special education services that he received from the second half of first grade were removed.  There is authority, including from this district court, that supports the Parent's argument.

In <u>Kevin T. v. Merrimack Valley Sch. Dist.</u>, No. C-96-485-B and <u>Kristeen T. v. Merrimack Valley Sch. Dist.</u>, No. C-96-516-B, slip. op. at 33 (D.N.H. Mar. 5, 1998), the court found that standard set forth in <u>Rowley</u> was inapplicable to determining issue of whether the plaintiffs were eligible to receive an IDEA services.  That is so because the Hearing Officer is not being asked to determine <u>what type of services</u> the School District owed an already eligible student to provide a free and appropriate public education, but rather the Hearing Officer must determine whether the student is eligible to receive <u>any</u> IDEA services at

all.  Id. at 34.  In such cases, the court found, "a standard
that assesses whether plaintiffs are passing from grade to grade
with the services being provided is not informative."  Id. at 34–
35.  The appropriate standard to be applied to an eligibility
determination "at a minimum looks to whether plaintiffs require
any special education or related services in order to pass from
grade to grade."  Id. at 35 (citing Yankton Sch. Dist. v.
Schramm, 93 F.3d 1369, 1374–75 (8th Cir. 1996) ("Yankton II");
Mary P. v. Ill. State Bd. of Educ., 919 F. Supp. 1173, 1180–81
(N.D. Ill. 1996); Letter to Pawlisch, 24 IDELR 959 (where a child
with an alleged learning disability is passing from grade to
grade with some services already provided, in determining whether
the child needs IDEA services, the school district should
evaluate whether the child is passing because of the services she
already receives)).  This Court finds the analysis set forth in
Kevin T. & Kristeen T. persuasive.  The Court finds that the
Hearing Officer's decision on Bryan's eligibility to continue
receiving special education services was based on the application
of an inapplicable legal standard.

A more appropriate question to be addressed in this case is
whether Bryan requires special education services in order to

31

obtain access to the general curriculum and to meet the curriculum's relevant educational standards.  With regard to that question, the Court notes that while the Hearing Officer found that "whatever residual impairment exists does not significantly interfere with the learning process to require special education services," the Hearing Officer also found that Bryan "is performing in the average range and up to grade level with support."  The evidence in the record supports a finding that Bryan's performance in the average range on the general curriculum was dependent on special education services.

From the second half of first grade through the fourth grade Bryan received special education services.  During his fourth grade year, Bryan received one hour of specialized instruction with Mrs. Saxton each day, and one half hour of one-to-one assistance from Mrs. Parent almost every day starting in November.  Even with the special education services that Bryan received, Bryan received only average grades, except in writing where his teacher testified that he had one of the lowest grades in the class.

The School District argues that even if Bryan has conditions that could be deemed disabling, he does not require specially-

designed instruction.  But the School District's argument is focused on Bryan's access to the grade level curriculum.  The term "specially-designed instruction" is more encompassing and includes adapting not only the curriculum content, but also the methodology or delivery of instruction.  See 34 C.F.R. § 300.26. The Court does not find, based on its review of the record, that the evidence supports a finding that Bryan does not require any special education or related services in order to obtain access to the general curriculum and to meet the educational standards of that curriculum.  Nor is it clear to the Court that the Hearing Officer would have reached the same conclusion if she had considered the eligibility issue under the proper standard.

Since the School District has not demonstrated that Bryan no longer has a specific learning disability, and because the Hearing Officer applied the wrong legal standard for determining whether Bryan continued to be eligible for special education services, the Court finds that the Hearing Officer's decision that Bryan is no longer eligible to receive special education services is not entitled to deference.  The Court further finds that the School District has not demonstrated by a preponderance of the evidence that Bryan does not require any special education

or related services in order to obtain access to the general
curriculum and to meet the educational standards of that
curriculum.  Accordingly, the Hearing Officer's decision that the
School District is not required to continue providing Bryan
special education services must be reversed.[8]

III. Whether the School District's Evaluation Was Inappropriate

In response to the evaluations performed by the School
District, the Parents sought an independent evaluation.  The
School District then initiated a due process hearing.  The
applicable regulation provides that, "If the public agency
initiates a hearing and the final decision is that the agency's
evaluation is appropriate, the parent still has the right to an

---

[8]In light of the Court's finding on the eligibility issue,
the Court need not address the Parents' argument that the New
Hampshire Supreme Court raised the standard for measuring a free
and appropriate education in Claremont Sch. Dist. v. Governor,
142 N.H. 462 (1997).  To the extent that the issue is not moot,
however, the Court rejects the Parent's argument.  See Greenland
Sch. Dist. v. Amy N., 358 F.3d 150, 156 (1st Cir. 2004) (finding
that New Hampshire implements the IDEA through its special
education law and that a student's rights under New Hampshire law
are the same as the student's rights under federal law and no
greater); see also Lt. v. Warwick Sch. Com., 361 F.3d at 83
(finding that Rowley remains good law and sets forth the standard
by which a school district's compliance with the IDEA is measured
even after the 1997 amendments to the IDEA).  The Court further
finds that the Parents' arguments that the School District
violated Bryan's rights under RSA 193E:1 and 2 and Part II,
Article 83 of the New Hampshire Constitution are without merit.

independent educational evaluation, but not at public expense."
34 C.F.R. § 300.502(b)(3).  The issue that the Hearing Officer
was required to determine then was whether the Parents
demonstrated that the School District's evaluation was
inappropriate.  See, e.g., Holmes v. Millcreek Township Sch.
Dist., 205 F.3d 583, 590–591 (3d Cir. 2000).

The Hearing Officer stated in her decision that "It is when
inadequacy is questioned and shown in a school district's
evaluation that an independent educational evaluation is
compensable and that is not the case."  The Hearing Officer's
conclusion does not hold up under scrutiny.

The evidence shows that the Parent's questioned the adequacy
or appropriateness of the School District's evaluations used to
support of its conclusion that Bryan no longer qualified for
special education services.  The Parents obtained an IEE
performed by Ms. Freeman that questioned the adequacy and
thoroughness of the School District's evaluation.  The Hearing
Officer made the following findings with regard to Ms. Freeman's
evaluation in her decision:

> Numerous deficits are noted.  All but one of the scores
> on subtests measuring auditory perceptual skills were
> significantly below average reminiscent of earlier test
> results.

<u>See</u> Admin. R., Vol. I, Ex. 29, Part IV.  Following those findings, the Hearing Officer then concluded, without any further explanation, that Ms. Freeman's testimony "proved insufficient to do more than raise additional questions regarding the issues at hand."  <u>Id.</u>

While the Hearing Officer's conclusion suggests that the Hearing Officer gave Ms. Freeman's testimony little weight, it does not answer the question of whether the School District's evaluations were appropriate.  The independent evaluator's specification of additional areas of inquiry that should have been explored by the School District before it determined that Bryan no longer needed special education services is a legitimate way to demonstrate that the School District's evaluations were not appropriate.  Furthermore, the Hearing Officer did not find that the tests that the School District's Speech Language Pathologist administered, which differed from those administered by Ms. Freeman, were adequate or appropriate for Bryan's reevaluation considering Bryan's previously found disability.

Moreover, the Hearing Officer noted that Ms. Freeman found that Bryan scored significantly below average on subtests measuring auditory perceptual skills.  Those findings appear to

be relevant to the issue of whether Bryan continues to have a specific learning disability.  Therefore, Ms. Freeman's evaluation supports a finding that the School District's evaluation was incomplete and thereby inappropriate.  The Court finds that the Hearing Officer's decision on the reimbursement issue must be reversed.

Conclusion

This is a close case on the evidence.  The Hearing Officer's failure to apply the correct legal standards to the issues presented made the Court's review of this case even more difficult.

For the reasons set forth above, the Court finds that the Plaintiff is entitled to an individualized education plan until such time as the School District demonstrates under the proper legal standard that the Plaintiff no longer needs special education services.  The Court further finds that the Parents are entitled to reimbursement from the School District for the cost of the independent educational evaluation that they had performed to support the Plaintiff's claim of entitlement to continued special education services.

The Plaintiff is the prevailing party.  Each party shall bear its own costs and expenses.  The Clerk of Court shall enter judgment in favor of the Plaintiff and close the case.

**SO ORDERED.**

James R. Muirhead
United States Magistrate Judge

Date: August 16, 2005

cc:  Colleen A. Micavich, Esq.
     Diane M. McCormack, Esq.